## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

WILLIAM COALE,

           Plaintiff,

   v.

METRO-NORTH RAILROAD COMPANY,       3:09-CV-02065 (CSH)

        Defendant.

## RULING ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**HAIGHT**, Senior District Judge:

### I.      Introduction

This is an employment discrimination case. Plaintiff William Coale (hereafter "Plaintiff" or "Coale") accuses his former employer, Metro-North Railroad Company (hereafter "Defendant" or "Metro-North"), of violating the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. Defendant denies all liability, and now moves for summary judgment dismissing the Complaint.

### II.     Background

Plaintiff, who began working for Defendant in December of 2001 as an Assistant Conductor, suffered an injury in the Stamford Yard on September 12, 2002 when stepping off a train while at work. *See* [Doc. 56-2]. This injury left Plaintiff unable to work for a period of approximately eight and a half months; he was cleared to return to full-duty work without medical restrictions on June

1

4, 2003. *See* [Doc. 56-3]. In late November of 2002, Defendant informed Plaintiff that he might "be eligible for a Reasonable Accommodation under the Americans with Disabilities Act or Vocational Assistance," providing instructions as to how to pursue either and informing him that any request for either "a Reasonable Accommodation or Vocational Assistance," along with "all medical information[,] [would] be kept separate and confidential." [Doc. 56-9] at 2. Plaintiff completed and signed an ADA Reasonable Accommodation or Vocational Assistance Request Form on December 7, 2002, writing that "[p]er diagnosis, a tendon in [his] right heel/ankle may become [aggravated] or tender due to constant standing for long periods of time while on a moving train," and as "[t]he constant moving/jostling of the train make it necessary for conductors/trainmen to constantly brace themselves using their legs [and] feet only, keeping hands free for work, ... Per Metro-North Director of Health[,] a job change which does not require the above[] is necessary." [Doc. 56-10].

Around March of 2003, Plaintiff applied for the position of Yardmaster, a position which presumably would be fitting for the medical needs Plaintiff described in the ADA Reasonable Accommodation or Vocational Assistance Request Form which he signed and dated December 7, 2002. On May 21, 2003, Defendant's Employee Abilities Specialist Linda Kerwood wrote a letter to Plaintiff noting that although he had been "invited to take the Yardmaster test" on March 31, 2003, Plaitniff "did not respond to this invitation," and that while "[o]n April 23, 2003, [Kerwood had] mentioned the Block Operator [position] vacancy" to Plaintiff, and Plaintiff had "stated that [he] would let [her] know by April 25, 2003[] if [he was] interested in this position," but Plaintiff had not followed up with a response. [Doc. 56-11] at 2. In such letter, Ms. Kerwood informed Plaintiff that, "[s]ince the ADA accommodation process relies on both parties' interaction to meet its goal, [she could] only assume that [Plaintiff was] not interested in pursuing a request for a reasonable

2

accommodation at this time," and was, "therefore, closing [his] file." *Id.*; *see also, e.g.,* [Doc. 56-12] at 2-3.

As stated *supra*, Plaintiff returned to full-duty work on June 4, 2003 without any medical restrictions.  Plaintiff received a promotion to Control Center Coordinator approximately three months after his return to full-duty work for Defendant, *see* [Doc. 56-4], and in this capacity worked for Defendant's Fire Command Center.  Plaintiff voluntarily resigned from this position by letter, writing on October 11, 2004 that he would "be reestablishing [his] seniority in Train Service Operations as an Assistant Conductor," and that his "last day in the Fire Command Center [would] be[] Wednesday[,] November 3, 2004." [Doc. 56-5] at 2.

Plaintiff avers that from late 2005 through early 2006, Plaintiff discussed with Marcellus Edwards, then Defendant's Assistant Director of Defendant's Training Department, the possibility of becoming a training instructor for Defendant.  Such a position falls under the category of a "special duty" assignment for the railroad, which Delana Glenn, then Defendant's Chief Training Officer in the Training and Development Department, described as "not a job," but rather a kind of temporary assignment.  *See* [Doc. 56-19] at 13.  Ms. Glenn further noted that when an employee holds a "special duty job, [that employee is] still in [his or her specific] craft, ... still covered by the labor agreement." *Id.*  Thus, Ms. Glenn explained, if a conductor were "asked ... to perform some special work [one day]," that conductor would be performing the work "as a conductor," and the job that conductor "own[ed] [would remain] conductor." *Id.*  In other words, Ms. Glenn stated, "[e]mployees assigned to special duty are not at-will employees; rather, throughout the duration of the special duty terms, they remain subject to the collective bargaining agreements between their unions and Metro-North." [Doc. 56-20] at 3.  Thus "[a] special duty training instructor is someone

3

who is temporarily assigned to the Training Department to assist the training officers," [Doc. 56-19] at 4, and when "upcoming training needs exceeded current instructor availability" within Defendant's Training Department, non-management employees would be assigned "to special duty to assist the instructors." [Doc. 56-20] at 3. In such circumstances, there was "no need to add a permanent resource." [Doc. 56-19] at 4.[1]

Plaintiff claims that "[o]n or about February 10, 2006, Mr. Edwards called [Plaintiff] to say the job was his and that [Plaintiff] could start on February 15, 2006 at 9:00 a.m.;" however four days later Plaintiff spoke again with Mr. Edwards and "Mr. Edwards informed him that [Plaintiff] could not have the Training Instructor job due to a previous on the job injury from about three years ago." [Doc. 1] at 3-4; *see also*, *e.g.*, [Doc. 56-20] at 3-4. Defendant concurs with Plaintiff's description to the extent that Defendant agrees that "[w]ith respect to the 2006 special duty assignments, [Mr.] Edwards reached out to [Mr.] Coale [along with] another Assistant Conductor, Rebecca Rourke," *see* [Doc. 58] at 10; however, Defendant disputes nearly all Plaintiff's other allegations in this regard including notably that the special duty training instructor position was ever officially offered to Plaintiff. To the extent that Plaintiff and Defendant are in accord: Defendant states that as both Plaintiff and Ms. Rourke "indicated an interest in working special duty," Mr. Edwards "then

---

[1] Defendant also avers that special duty assignments are not equivalent to management positions, although they may give their holders some degree of visibility within the railroad which is helpful for obtaining management positions in the future. [Doc. 56-19] at 10. Such assignments are also not salaried positions per se, but rather their temporary holders receive extra pay on top of the base salary for the positions they already hold with Defendant. *Id.;* see also [Doc. 56-21] at 8 (in which Mr. Edwards states that the pay for the special duty training instructor job pay rate essentially came out to two hours of overtime of extra pay per day along with one "no meal" per day.) "The decision whether to assign [certain] employees to special duty for such purposes, and the ultimate decision of whom to assign, resided with" Ms. Glenn. [Doc. 56-20] at 3.

4

proceeded with Coale's background check[, ...] report[ing] his findings to [Ms.] Glenn, including that [Mr.] Coale's safety record showed the 2002 on-the-job injury." *Id.* at 10-11.  Ms. Glenn has averred that Mr. Edwards advised her that Plaintiff "had returned to work full duty, that is, without medical restriction, following the 2002 accident," but "did not provide [Ms. Glenn] with any medical information or details concerning [Plaintiff's] 2002 accident, injuries[,] or medical treatment, and [she] drew no inferences and formed no opinions regarding [his] physical abilities, either at the time of his accident or at the time [she] learned of the 2002 accident." [Doc. 56-20] at 4.

Beyond this, however, Defendant's account of the events in question differs from that of Plaintiff.  In addition to Defendant disagreeing as to whether Plaintiff was ever formally offered the special duty assignment of training instructor, Defendant avers that the reason Plaintiff was not chosen for this position was not due to any ADA-protected disability, perceived or otherwise, but rather because those individuals making decisions with respect to who ought to hold special duty training instructor positions felt that prospective candidates would be more credible as training instructors were they to have accident-free work histories.  Indeed, Ms. Glenn has stated that "[i]n light of Metro-North's strong emphasis on safety, and in light of the significant role the Training Department plays in convening this emphasis [she] believed that it was best for special duty training instructors to have clear safety records, that is, not to have been involved in any accidents during their employment with Metro-North."  *Id.*  She further stated that she "understood this to be a longstanding practice of the Training Department with regard to special duty training instructor assignments, although [she] was never formally advised or instructed to follow this practice."  *Id.* at 5.  Accordingly, "[b]ecause Marcellus Edwards informed [her] that William Coale had been involved in an accident in 2002, during his first year of employment with Metro-North, [she] decided

not to place William Coale in the special duty training instructor assignment." *Id.* Ms. Glenn has averred that she "based this decision solely on [her] preference for a candidate who had not been involved in any accidents, regardless of fault, severity[,] or any injuries that might have resulted," and that she "believed that an employee with no accidents on record would have superior credibility regarding safety in front of groups of newly hired employees" to an employee who "had been involved in any accident, even if the accident did not result in injury, or resulted only in minor injury," as the latter type of employee's "credibility regarding safety might be compromised." *Id.* Ms. Glenn stated that she therefore "believed it was important to place in the special duty assignment employees who could stand as examples of accident-free work at Metro-North." *Id.*

Ms. Glenn also emphasized that her focus in this regard was solely upon a employee's safety record and, indeed, "[i]n deciding whether to place [a candidate] employee in a special duty training instructor assignment, [she] did not consider or review [that candidate's] medical records;" accordingly, she averred that "[a]t the time [she] decided not to place William Coale in the special duty training instructor assignment in 2006, [she] had not reviewed [his] medical records or medical information on file with Metro-North," and, moreover, at that time she "did not believe William Coale [to be] physically or mentally incapable of performing the duties of special duty training instructor for Metro-North, or the duties of any other position or assignment with Metro-North ... [or] outside Metro-North or the railroad industry." *Id.* at 6-8. Ms. Glenn also stated that she was then and continued to be through the time of her deposition in this matter several years later "unaware whether William Coale has any physical or mental impairment." *Id.* at 8.

Defendant has averred that in contrast with Plaintiff's background check, the background check for Ms. Rourke who, as noted *supra*, was also in contention for a special duty Training

Instructor assignment, did not reveal any performance, attendance, or safety issues; consequently Ms. Glenn authorized Ms. Rourke for the special duty assignment. *See* [Doc. 58] at 12.  Consistent with her other testimony, Ms. Glenn has stated that she "based this decision solely on [her] preference for a candidate who had not been involved in any accidents, regardless of fault, severity[,] or any injuries that might have resulted," as she "believed that an employee with no accidents on record would have superior credibility regarding safety in front of groups of newly hired employees," and "it was important to place in the special duty assignment employees who could stand as examples of accident-free work at Metro-North." [Doc. 56-20] at 5.

On March 1, 2006, Plaintiff initiated a telephone call with Ms. Glenn, which he recorded without her knowledge or consent, the transcript of which is provided as [Doc. 56-23].[2]  In this conversation, Plaintiff informed Ms. Glenn that he had phoned her because he "was turned down for the job" of special duty instructor "because of a minor injury," and that he was "curious as to why because of a very minor injury [he] was told [he] couldn't have the job." [Doc. 56-23] at 2.  Ms. Glenn explained: "That's the policy.  That's the policy we've established with [Operations] Services, when we select people for special duty they have to have no attendance problems, no injury problems, no discipline problems," and stated that the Crew Management Department did not want to assign a special duty job "to anybody with any kind of issues on their record, [which had] always been the policy." *Id.* at 2-3.

Plaintiff avers that at Metro-North "Training Instructor jobs," such as the one for which he was considered in 2006, "are very important because they expose employees to Management and

---

[2]   The Court notes that it has also listened to and reviewed an audio recording of this telephone conversation, as provided by Plaintiff.

serve as a common springboard into other Management positions at Metro[-]North." *Id.* at 4.  He

further avers that he was "disabled within the meaning of the ADA in that he was regarded by ...

[D]efendant as having an impairment that substantially limited the major life activity of working,"

and that "[D]efendant regarded [him] as significantly restricted in the ability to perform a class of

jobs or a broad range of jobs in various classes as compared to the average person having comparable

training skills and abilities." *Id.*  Plaintiff contends, among other allegations, that Defendant's

"aforementioned actions were made with malice or reckless indifference to ... [P]laintiff's federally

protected rights," that they violated the ADA, and that they resulted in Plaintiff's suffering damages.

The Court notes that, in addition and in response to the Court's January 7, 2014 Order directing the

parties to this lawsuit to submit supplemental briefing, Plaintiff also contends that Defendant "based

its decision not to promote him upon review of records from his 2002 right foot injury and his nearly

nine month absence from work," [Doc. 93] at 1, and that Defendant's alleged discrimination was also

based upon Plaintiff's record of a disability.  Thus Plaintiff avers that Defendant "perceived him as

disabled from performing ... all Special Duty jobs, all Operations Manager jobs, and management

jobs." [Doc. 69] at 12.[3]

      Defendant responds that Plaintiff's claims must "fail because Metro-North *never* considered

---

[3]  The Court also notes that there is a dispute between the Parties as to whether any
applications by Plaintiff for management positions, as opposed to solely his application for the
special duty training instructor assignment he sought between 2005 and 2006, are properly before
this Court.  In Defendant's view, as "the special duty assignment decision was the sole basis for
[Plaintiff's] Equal Employment Opportunity Commission complaint and for the complaint he
filed with this Court," Defendant "maintains that [any of Plaintiff's other] management decisions
are not properly before this Court." [Doc. 94] at 2 n.1.  The Court need not and does not make a
determination as to whether any of Plaintiff's other internal job applications with Defendant are
properly adjudicated within this action or before this Court because, assuming *arguendo* that they
were, the Court's analysis and resulting Ruling would not be different.

[Plaintiff's] physical abilities in making the personnel decisions at issue in this case and, thus, could not have regarded him as being disabled" – and that, "[i]ndeed, there is no evidence whatsoever that the decision makers, with respect to the special duty assignment or the management positions, were even aware of the details surrounding [Plainitff's] prior injury or his medical treatment following the injury." [Doc. 58] at 2 (emphasis in original).  Defendant further notes that following his 2002 injury in the Stamford Yard,  Plaintiff "had returned to work without medical restrictions and not only had worked full time, full duty in his craft as an Assistant Conductor, but he also had been promoted to a management position in 2003, which he held for approximately one year, until he voluntarily decided to return to his craft." *Id.*  Thus Defendant concludes that Plaintiff "essentially claims that Metro-North discriminated against him on the basis of his *safety*" – and not his disability or medical – "record with the company, particularly on the basis of his prior on-the-job injury," and that, even if such allegations "were true, which Metro-North expressly denies, this is not the same as discrimination 'because of [a] *disability*,' which is what the ADA prohibits." *Id.* at 3 (emphasis in original).

### III.    Standard of Review

The standards for summary judgment are familiar.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009).  The moving party, in this case Defendant, bears the burden of showing that it is entitled to summary judgment.

Once it has satisfied this burden, in order to defeat the motion the party opposing summary judgment, in this case the Plaintiff, "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted). A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009). It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).

In order to present a "genuine issue of material fact" the nonmoving party must therefore present contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. Consequently the nonmoving party must present affirmative evidence in order to defeat a properly supported summary judgment motion. As the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Id.* at 247-48, if the nonmoving party submits

evidence that is "merely colorable," summary judgment may be granted. *Id.* at 249-50.  In sum, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 322.

## IV.    Legal Discussion

Plaintiff's claims are rooted in events which took place in 2005 and 2006, i.e., well before the ADA was amended by the ADA Amendment Act of 2008, Pub. L. No. 110-325 (2008), which took effect on January 1, 2009.  Consequently the Court evaluates the present case "pursuant to the law that was applicable at the time [Defendant] allegedly violated [Plaintiff's] rights under the ADA," which is to say, under the prior version of the statute. *See, e.g., Brown v. Malverne Union Free School Dist.*, 381 Fed. Appx. 85, 87 n.2 (2d Cir. 2010) (noting that "[a]lthough Congress amended the ADA in 2008 ... we here apply the version of the statute in effect during the time period at issue," as the 2008 ADA amendments were not retroactive) (citations omitted); *see also, e.g., Brown v. City of Waterbury Board of Education*, 722 F.Supp. 2d 218, 227 n.5 (D.Conn. 2010).  All analysis and quotations of the ADA within this Ruling, as well as all references to EEOC regulations and caselaw pertaining thereto, accordingly concern the statute as it existed in the relevant time period.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability ... in regard to ... job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges or employment."  42 U.S.C. § 12112(a) (2008).  Such discrimination includes "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of [his or her] disability," as well as

"using qualification standards, employment tests[,] or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test[,] or other selection criteria ... is shown to be job-related for the position in question and is consistent with business necessity."  42 U.S.C. § 12122(b)(1) (2008) and (b)(6) (2008).

In order to make out a prima facie case of disability discrimination under the ADA, a plaintiff must establish that:  (1) the plaintiff's employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability.  *Palmieri v. City of Hartford*, 2013 WL 2398365 at *9 (D.Conn. 2013) (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)); *see also, e.g., Howell v. New Haven Board of Education*, 309 F.Supp. 2d 286, 290 (D.Conn. 2004).

In the case at bar, Plaintiff and Defendant are in accord that the lynchpin of Plaintiff's prima facie case is whether Plaintiff is able to present significant probative evidence showing that he falls under the category of "disabled" as that term is defined and applied by relevant portions of the ADA – i.e., whether Plaintiff is able to adequately meet the second enumerated prong of the prima facie test for disability discrimination under the ADA.  At the time of the events in question, the ADA defined disability as: "(A) a physical or mental impairment that *substantially limits one or more of the major life activities of such individual*; (B) a record of such an impairment; of (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2) (2008) (emphasis added).

Neither Plaintiff nor Defendant claims that Plaintiff is, or was at the time of the events in question, *actually* suffering from such an impairment– i.e., that Plaintiff at the time of the

employment events with which this matter is concerned had a physical or mental impairment that substantially limited one of more of his major life activities.  Rather, Plaintiff contends that there are "genuine issues of material fact concerning: (1) whether [Defendant] *perceived* Mr. Coale as disabled from working a broad class of jobs within the meaning of the ADA; and (2) whether [Defendant's] policy and practice of not promoting employees with [a record of] lost time injuries violated the ADA." [Doc. 69] at 1 (emphasis added).  Such contentions implicate prongs (B) and (C) of the definition of disability provided in 42 U.S.C. § 12102(2) (2008).  The Court will address each in turn.

### A.    Subsection (B): "A Record of Such an Impairment"

Plaintiff avers that Defendant "based its decision not to" select Plaintiff for the special duty assignment of training instructor "upon review of records from his 2002 right foot injury and his nearly nine month absence from work," and that, consequently, Defendant discriminated against Plaintiff in violation of 42 U.S.C. § 12102(2)(B) (2008) of the ADA.  [Doc. 93] at 1.[4]

While the Court is sympathetic to Plaintiff's claims, it does not agree with Plaintiff's conclusions.  As the Second Circuit has stated, "[t]he intent of the ['record of'] prong of the ADA, in part, is to ensure that people are not discriminated against because of a history of disability." *Horowitz v. L. & J.G. Stickley, Inc.*, 20 Fed. Appx. 76, 78 (2d Cir. 2001) (internal quotation marks

---

[4]   On January 7, 2014, the Court issued an Order, [Doc. 92], noting that "[w]hile much of the parties' briefing concern[ed] whether Defendant 'perceived Mr. Coale as disabled within the meaning of the ADA,' implicating the possible application of prong (C) of 42 U.S.C. § 12102(2) to the facts alleged in the case at bar," the parties' briefs did "not address at any length the applicability of prong (B) under the same statute." [Doc. 92] (citations omitted).  Accordingly, the Court raised "the question of this prong's applicability sua sponte," and, "[i]n consequence, ... direct[ed] the parties to address the applicability, if any, of 42 U.S.C. § 12102(2)(B) to this action" in supplemental briefs.  *Id.* (citations omitted).  The parties submitted such briefs in compliance with this Order on February 7, 2014.  *See* [Doc. 93] and [Doc. 94].

and citation omitted).   Indeed, "[a]ccording to Equal Employment Opportunity Commission ('EEOC') regulations, '[t]his part of the definition [of disability] is satisfied [only] *if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment.* The impairment indicated in the record *must be an impairment that would substantially limit one or more of the individual's major life activities*.'" *Id.* (emphasis added) (citation omitted).   Thus "a plaintiff must show more than a [mere] history of a medical ailment;" rather, he or she "must show that [he or she] ha[s] a record of disability, and that th[is] disability *substantially limited* [his or her] ability to perform major life activities." *Id.* (emphasis added).   Such a record, therefore, "must be one that shows an impairment that satisfies the ADA; a record [which simply] reflect[s] a plaintiff's classification as disabled for other purposes or under other standards is not enough." *Colwell v. Suffolk County Police Department*, 158 F.3d 635, 645, 647 (2d Cir. 1998).[5]   It is "not enough ... that [the plaintiff's] employer regarded [the plaintiff] as somehow disabled; rather, the plaintiff must show that the employer regarded [him or her] as ... having an impairment that substantially limited a major life activity." *Id.*

Indeed, as the applicable EEOC Interpretative Guidance states, for purposes for fulfilling the

---

[5]   The Court notes that this interpretation of the ADA might not be applicable to events which occurred subsequent to the application of the 2008 Amendments, due to the inclusion of 42 U.S.C. § 12102(3)(A), pursuant to which "[a]n individual meets the requirement of 'being regarded as having such an impairment'" for purposes of 42 U.S.C. § 12102(1)(C) "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *See, e.g., Ragusa v. Malverne Union Free School District*, 381 Fed. Appx. 85, 88 (2d Cir. 2010) (noting that the relevant aspect of the *Colwell v. Suffolk County Police Department*, 158 F.3d 635 had been superceded by the inclusion of 42 U.S.C. § 12102(3)(A) in the 2008 ADA Amendments, but applying the prior version of the statute, and the *Colwell* precedent, in an evaluation of events predating the 2008 ADA Amendments).

14

"record of" prong under the ADA's definition of disability, "[t]he impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities;" consequently "[t]he fact that an individual has a record of being a disabled veteran, or of disability retirement, or is classified as disabled for other purposes does not guarantee that the individual will satisfy the definition of 'disability' under [this section]."   29 C.F.R. Pt. 1630 App. § 1630.2(k).[6]   This EEOC Interpretive Guidance in turn defines "major life activities" as "those basic activities that the average person in the general population can perform with little or no difficulty," and notes that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.  Such [temporary and non-chronic] impairments *may include, but are not limited to, broken limbs, sprained joints*, concussions, appendicitis, and influenza."  29 C.F.R. Pt. 1630 App. § 1630.2(i) and (j) (emphasis added).

Thus, while a broken leg, for example, might not qualify as such an impairment pursuant to the pertinent EEOC Interpretive Guidance, "an individual whose legs are paralyzed is substantially limited in the major life activity of walking because he or she is unable, due to the impairment, to perform that major life activity;" so, too, is "an individual who, because of an impairment, can only walk for very brief periods of time [be considered to] be substantially limited in the major area of walking."  29 C.F.R. Pt. 1630 App. § 1630.2(j).  Plaintiff, despite any potentially lingering arthritic symptoms from his 2002 injury, returned to work full-duty as an Assistant Conductor and remained in such a position during several of the years between his return to work and his application for a

---

[6]   The Interpretive Guidance quoted *supra*, i.e.,  29 C.F.R. Pt. 1630 App. § 1630, was effective through May 23, 2011.  It is applicable to the case at bar given the dates in which all relevant events took place.  Consequently all citations to 29 C.F.R. Pt. 1630 App. § 1630 within this Ruling cite this prior version of the EEOC's regulations.

special duty training instructor position.  Accordingly, as discussed in detail *infra*, the Court cannot conclude that Plaintiff was substantially impaired as contemplated by this portion of the ADA or accompanying EEOC regulations.  Indeed, "several factors ... should be considered in making the determination of whether an impairment is substantially limiting.  These factors are (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment." *Id.*

After a thorough review of the evidence on record and the pertinent caselaw the Court, while it is sympathetic to Plaintiff's claims, does not and cannot find that Plaintiff had a "record of such impairment" as contemplated by the relevant version of the statute.  The Court notes that no party in this action disputes that Plaintiff sustained a temporary injury to his ankle in 2002, from which he returned to work full-duty, nor does any party dispute that Delana Glenn was informed by Marcellus Edwards that Plaintiff had experienced such an on-the-job injury and that Plaintiff's employee file contained an injury report.  The relevant questions, then, are (1) whether there is a triable question of fact as to whether Plaintiff's 2002 injury rendered Plaintiff substantially impaired as defined and contemplated by the ADA; (2) whether there is a triable question of fact as to whether Plaintiff's record of such an injury, and subsequent eight and a half month medical leave, could be construed under the ADA as constituting a "record of" substantial impairment; and (3) whether there is a triable question of fact as to whether the sort of policy Plaintiff has described on the part of Defendant violates the ADA in light of its language and accompanying EEOC regulations.  The Court concludes that the answer to all three of these questions is "no."

The Second Circuit's 1998 ruling in the matter of *Colwell v. Suffolk County Police*

16

*Department* is particularly instructive with respect to how to apply the ADA's understanding of impairment to a claim that an individual has been discriminated against due to a record of disability under 42 U.S.C. § 12102(2)(B) (2008).  There, the Second Circuit stated with respect to an ADA action involving in relevant part a plaintiff police officer who claimed that he had been denied certain promotions due to the fact that he had previously been hospitalized for a hemorrhage and subsequently returned to work on "light" duty for a period of time:

> [The plaintiff's] hospitalization is certainly a *record* of an impairment, and the hemorrhage was certainly an impairment, but [the plaintiff] was required [under the ADA] to show that the impairment for which he was hospitalized was imposing a substantial limitation of one or more of his major life activities.  This [he] failed to do.  The only evidence of the extent of the impairment caused by [his] hemorrhage was that [he] (1) was hospitalized for approximately 30 days, (2) remained at home for approximately six months after his hospitalization, (3) returned to work in June 1985, and (4) was placed on light duty [within the police force for which he worked] with the above-mentioned restrictions until December 1992....

> A jury could reasonably find that [the plaintiff police officer] was unable to work during his recuperation from the hemorrhage (one month in the hospital and six months at home), but a seven-month impairment of [the plaintiff's] ability to work, with the non-particularized and unspecific residual limitations described on his police work, is of too short a duration and too vague an extent to be 'substantially limiting.'....

> ... [In order to demonstrate a record of a disability under the ADA the plaintiff] attempts to rely on the open-ended light duty – which he concedes is not evidence of a continuing disability – to prolong indefinitely the disabling experience of a single acute episode of hospitalization.  An employer that accedes to minor and potentially debatable accommodations ... does not thereby stipulate to the employee's record of a chronic and endless disability....

*Colwell v. Suffolk County Police Department*, 158 F.3d at 646 (citations omitted) (emphasis in original).

Citing *Colwell*, the Second Circuit held a few years later in *Horowitz v. L & J.G. Stickley, Inc.*, 20 Fed. Appx. 76 (2d Cir. 2001) that a receptionist claiming that she had been terminated from

her job in violation of the ADA did not satisfy the statute's requirements with respect to having a "record of" a disability under the statute, as, although she had been hospitalized for bipolar disorder on two occasions within the prior five years, she had been treated as an outpatient since that time and was able to perform major life activities with the assistance of medication. *Id.* at 81.  The Court of Appeals stated that "[a]lthough [the plaintiff] was limited in her ability to work during her periods of hospitalization, those incidents were brief and she has suffered no residual limitations substantially curtailing her ability to be employed or engage in other life activities ... *the mere fact of hospitalization, even coupled with continuing recovery or treatment, does not rise to the level of a substantially limiting condition*," particularly when the plaintiff's "medication ha[d] effectively controlled her disorder and allowed her to fully engage in all major life activities." *Id.* (emphasis added).

After carefully weighing the evidence and reviewing the controlling law, the Court agrees with Defendant's contention that "as a matter of law, ... [P]laintiff cannot satisfy the 'record of' prong [of the ADA] because [Defendant's] Safety Department record of [Plaintiff's 2002 foot] injury is not a record of any impairment" under the applicable sections of the statute, [Doc. 94] at 1, and that, moreover,  Plaintiff's 2002 ankle injury – from which he returned to work full duty and without medical restriction – was simply not a "substantially limiting impairment"under the ADA.  As discussed at length *infra*, the Court similarly agrees with Defendant's contention that even if Defendant *did* employ the sort of wide-spread employment policy Plaintiff alleges, such a policy, which focuses upon employees' safety records rather than on specific and substantially limiting impairments, cannot be held to violate the ADA.

**B.      Subsection (C): "Being Regarded As Having Such an Impairment"**

Plaintiff contends in his briefing that "[t]his case is about how [Defendant's] discriminatory policy and perceptions barred [Plaintiff] from being hired ... in any position in the broad class of management positions," and that "[s]imply put, there is ample evidence to allow a jury to find that [Defendant's] perception of [Plaintiff's] aggravated arthritic condition in light of [Defendant's] policy not to promote anyone with a lost time injury resulted in" the adverse employment events at issue in this matter. [Doc. 69] at 3-4.  While it is sympathetic to Plaintiff's claims, the Court must conclude that Plaintiff cannot be found to have been "regarded by" Defendant in the relevant time period to have had an impairment "that substantially limited] one or more of [his] major life activities" pursuant to 42 U.S.C. § 12102(2)(C) (2008) – and that, consequently, Plaintiff cannot succeed in making out a prima facie case of discrimination under the ADA.

As an initial matter, in order for Plaintiff – who received a promotion subsequent to returning to work after his 2002 injury and who had been working full-duty for Defendant between his return to work in June of 2003 and his application for a special duty position in late 2005 – to demonstrate that he was "regarded as substantially limited in [his] ability to work," he bears "the burden of proving that [Defendant] 'perceived [him] to be incapable of working in a broad range of jobs' suitable for persons of [his] age, experience, and training."  *Colwell v. Suffolk County Police Department*, 158 F.3d at 647 (citation omitted).  As the Second Circuit noted in *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2d Cir. 1998), "[a]lthough almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.  Thus, in assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit*

19

those life activities." *Id.* at 870.

The EEOC Interpretive Guidance concerning the application of the "regarded as" prong contained within 42 U.S.C. § 12102(2) (2008) provides that "[t]here are three different ways in which an individual may satisfy the definition of 'being regarded as having a disability'": (1) he or she "may have an impairment which is not substantially limiting but is perceived by the employer ... as constituting a substantially limiting impairment;" (2) he or she "may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment;" or (3) he or she "may have no impairment at all but is regarded by the employer ... as having a substantially limiting impairment." 29 C.F.R. Pt. 1630 App. § 1630.2(l).  The EEOC regulations further state:

> An individual satisfies the first part of this definition if the individual *has an impairment that is not substantially limiting, but the covered entity perceives the impairment as being substantially limiting*. For example, suppose an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individual to less strenuous work because of unsubstantiated fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled.

> An individual satisfies the second part of the "regarded as" definition if the individual has *an impairment that is only substantially limiting because of the attitudes of others toward the condition*. For example, an individual may have a prominent facial scar or disfigurement, or may have a condition that periodically causes an involuntary jerk of the head but does not limit the individual's major life activities. If an employer discriminates against such an individual because of the negative reactions of customers, the employer would be regarding the individual as disabled and acting on the basis of that perceived disability....

> An individual satisfies the third part of the "regarded as" definition of "disability" if the employer ... *erroneously believes the individual has a substantially limiting impairment that the individual actually does not have*. This situation could occur, for example, if an employer discharged an employee in response to a rumor that the employee is infected with Human Immunodeficiency Virus (HIV). Even though the rumor is totally unfounded and the individual has no impairment at all, the individual is considered an individual with a disability because the employer perceived of this individual as being disabled.

Thus, in this example, the employer, by discharging this employee, is discriminating on the basis of disability.

29 C.F.R. Pt. 1630 App. § 1630.2(l) (citations omitted).

Plaintiff makes no allegation with respect to how any individuals other than those working for Defendant perceived a report of his 2002 injury; accordingly the second-enumerated prong is inapplicable to the facts at bar and the Court will not discuss it further. While Plaintiff essentially attempts to argue in his briefing that Defendant's behavior toward him implicated the first- and third-enumerated prongs, there is nothing in evidence before this Court which shows, or even suggests, that any alleged adverse employment actions arose out of Defendant's belief or perception, however erroneous, that Plaintiff had a *substantially limiting impairment* under the ADA, i.e., one which substantially limited from performing or taking part in major life activities.

Consequently, even when resolving all ambiguities and draw all inferences in favor of Plaintiff, as the Court must for purposes of summary judgment practice, the Court does not find that there is any genuine issue of material fact as to whether Defendant regarded Plaintiff as having a substantially limiting impairment such that a reasonable jury could return a verdict for Plaintiff. Thus even if Delana Glenn *had* actually reviewed those documents comprising Plaintiff's employee safety record including those which described and concerned his 2002 injury – rather than merely been verbally informed that Plaintiff had sustained an on-the-job – *see, e.g.,* [Doc. 94] at 3; [Doc. 58] at 10-11; [Doc. 56-20] at 3-4; [Doc. 56-21] at 17-19 – her direct knowledge of such a record and of Plaintiff's 2002 injury and resulting lost time would not, in and of itself, suggest that Ms. Glenn or any other employee of Defendant regarded Plaintiff as

21

having an impairment that substantially limited a major life activity.[7]

The details of the March 1, 2006 telephone call which Plaintiff initiated with Ms. Glenn further reinforce Defendant's contention that there is no genuine issue of material fact as to whether Defendant regarded Plaintiff as having an impairment which substantially limited life activities. *See* [Doc. 56-23]. In this telephone call, Plaintiff himself informed Ms. Glenn that he had contacted her because he "was turned down for the job" of special duty instructor "*because of a minor injury*," and that he was "curious as to why *because of a very minor injury* [he] was told [he] couldn't have the job." *Id.* at 2 (emphasis added). Ms. Glenn explained: "That's the policy. That's the policy we've established with [Operations] Services, *when we select people for special duty they have to have no attendance problems, no injury problems, no discipline problems*," and that the Crew Management Department did not want to assign a special duty job "to *anybody with any kind of issues on their record, [which had] always been the policy*." *Id.* at 2-3 (emphasis added). However inappropriate or misguided such a policy might have been, a question on which the Court takes no position, under such a description and pursuant to the

---

[7]   With respect to her decision-making in this respect, Ms. Glenn states that when Marcellus Edwards presented Plaintiff, who was working full-duty and who had received a promotion after returning to work subsequent to his 2002 injury, to her "as a potential candidate for the assignment, he also informed [her] ... that [Plaintiff] had had an on-the-job injury in 2002," as well as that Plaintiff had subsequently "returned to work full duty, that is, without medical restriction, following [his] 2002 accident, and that [Plaintiff] had been promoted to a management position following the 2002 accident." [Doc. 56-20] at 4. She avers that "Marcellus Edwards did not provide [her] with any medical information or details concerning [Plaintiff's] 2002 accident, injuries[,] or medical treatment, and [she] drew no inferences and formed no opinions regarding [Plaintiff's] physical abilities, either at the time of his accident or at the time [she] learned of the 2002 accident from Marcellus Edwards." *Id.*

22

evidence on record, it cannot be held to violate the "regarded as" prong of the ADA.[8]

The Court notes that Defendant denies in its pleadings that it employed any sort of wide-spread policy precluding employees who had prior injury reports from receiving promotions or management-level positions. In support of this contention, Defendant notes that in 2006 – i.e., the year in which Plaintiff here alleges he was denied a particular special duty position at Metro-North due to disability discrimination – of the fourteen employees Defendant promoted to management positions, seven had prior on the job injuries and accompanying injury reports. *See* [Doc. 84-11] and [Doc. 84-12]. Put another way, a full 50% of the employees who received promotions to management positions in that year had injury reports, presumably in their employee files. Plaintiff counters Defendant's claims by noting that these seven promotion-receiving individuals did not need to take time off from work for their injuries, and that Defendant's discrimination is focused upon employees who had prior lost time injuries. Indeed, Plaintiff states, "not one of the ... employees promoted to manager in 2006 ... had an injury that resulted in lost time from work," and "[a]n injury that results in missing time from work is obviously more severe than an injury that does not result in lost time from work," [Doc. 69] at 2; thus Defendant "perceived [Plaintiff] as disabled from all [such aforementioned] positions because (unlike any of the 14 candidates promoted to Manager positions ... in 2006), [Plaintiff] had an injury that aggravated an arthritic condition that caused him to lose time from work." *Id.*

For the same reasons discussed *supra*, Court does not find Plaintiff's allegations in this

---

[8]   The Court also notes that, while this conversation took place after Ms. Glenn made the employment decision in question, Plaintiff himself informed Ms. Glenn that his injury had been "very minor," i.e., not the sort of injury which resulted in an impairment which substantially limited major life activities.

regard to be sufficient to allow Plaintiff to make a *prima facie* case under the ADA.  Even

assuming *arguendo* that Defendant *did* have a wide-sweeping policy or practice of *considering*

employees' injury records or, specifically, lost time injury records, in connection with special

duty assignments or promotions – which as noted *supra* Defendant vigorously denies – Plaintiff

has not and cannot demonstrate that Defendant *regarded him or, for that matter, any other*

*employees with injury reports on their records, as having an impairment that limited a major life*

*activity*.  "To prove that [he was] regarded as *substantially limited* in [his] ability to work,

[Plaintiff bears] the burden of proving that [Defendant] perceived [him] to be incapable of

working in a broad range of jobs suitable for persons of [his] age, experience, and training."

*Colwell v. Suffolk County Police Department*, 158 F.3d at 647 (internal quotation marks and

citation omitted) (emphasis in original).

       The Second Circuit's recent ruling in *Ragusa v. Malverne Union Free School District*,

381 Fed. Appx. 85 (2d Cir. 2010) is instructive.  There, the Court of Appeals held that a plaintiff

mathematics teacher who had undergone surgery to remove a benign brain tumor had not

provided evidence sufficient to support a finding that she had a "substantial limitation" under the

ADA when she had offered no medical proof of related ongoing medical issues which she

claimed to experience.  *Id*. at 87-88.  The Court of Appeals further held that the plaintiff had

failed to raise a jury question as to whether the defendants in that matter *regarded her* as having

such a limitation, as under the applicable version of the ADA, it was "not enough ... that the

employer regarded [the plaintiff] as somehow disabled; rather, the plaintiff *must show that the*

*employer regarded [her] as ... having an impairment that substantially limited a major life*

*activity*."  *Id*. at 88 (citation omitted) (emphasis added).  In *Colwell*, similarly, the Second Circuit

held that "[c]ontinuous assignment of a policeman to non-confrontational positions does not permit the inference that the officers were regarded as *substantially limited* in their ability to do work," as "in order to prevail, [a plaintiff is] required to adduce evidence that [ a defendant] regarded [him] as having an impairment that substantially limited a major life activity."  *Colwell v. Suffolk County Police Department*, 158 F.3d at 646-7.

Particularly given that Plaintiff returned to work full-duty after his 2002 injury and moreover, given that Plaintiff has not provided any evidence that Defendant held any perception either that Plaintiff's 2002 injury or issues lingering therefrom substantially limited Plaintiff's ability to engage in any major life activity, this Court must follow the precedent laid by the Second Circuit both with respect to Plaintiff's individual-specific claims and with respect to Plaintiff's claims regarding Defendant's alleged internal employment and promotion policy at large.  Thus, under the evidentiary record and controlling law, the Court, while it is sympathetic to Plaintiff claims, GRANTS Defendant's Motion for Summary Judgment [Doc. 56].

## V.    Conclusion

For the forgoing reasons, Defendant's Motion for Summary Judgment [Doc. 56] is GRANTED in all respects.

The Clerk is directed to close the case.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        March 12, 2014


                                        /s/ *Charles S. Haight, Jr.*
                                        Charles S. Haight, Jr.
                                        Senior United States District Judge

25